# Bank of Montgomery *et al.* v. Ohio Buggy Co. *et al.*

*Bill of Equity to enforce a Trust.*

1. *Debtor and creditor; agreement of extension; implied trust.*— Where, upon the invitation of a debtor in embarrassing circumstances, his creditors meet and enter into an agreement between themselves and the debtor to extend their demands upon the promise by the latter they shall be paid in four instalments, and upon condition that the debtor shall incur no new indebtedness pending the extension, and if such new indebtedness is incurred, then all the claims so extended shall become due and collectible, if, upon the happening of the contingency provided for in such agreement, by the

debtor contracting new indebtedness, some of the assenting creditors accept from the debtor payment of their claims by a conveyance of his property, the property so conveyed is not, in the hands of the creditors to whom it is conveyed, a trust fund for the equal benefit of all the debtor's creditors, and such creditors do not thereby become, impliedly, trustees in possession of the property so conveyed to them, for the benefit of all the assenting creditors.

APPEAL from the Chancery Court of Montgomery.

Heard before the Hon. JERE N. WILLIAMS.

The bill in this case was filed by the appellees as creditors of the Montgomery Carriage Works against the appellants. The facts of the case, showing the agreement entered into between the creditors of the Montgomery Carriage Works and the Montgomery Carriage Works itself, are sufficiently stated in the opinion.

It was averred in the bill that "after entering into such agreement, to-wit, on the 31st day of December, 1892, being the day before the maturity of the first due of the notes given and accepted under said agreement in extension of said debts, the said Montgomery Carriage Works executed a bill of sale of substantially all their property to a part of the said creditors so agreeing to said extension, to-wit, (setting out the defendants to the bill), the consideration of said bill of sale being the payment of certain debts due to them by the Montgomery Carriage Works, which said debts were in existence at the time of, and extended under the terms of the proposition set out in exhibit A., thereby appropriating all the property of the said Montgomery Carriage Works to the payment of their debts, and to the exclusion of your orators and the other creditors of the said Montgomery Carriage Works, and in contravention of the terms and effect of said agreement shown by exhibit A. That the said defendants so receiving said bill of sale have taken possession thereof, and now hold the same claiming it as their own. And that said property so turned over to said defendants is of the value, towit, twenty thousand dollars. That the said Montgomery Carriage Works made default in the payment of the extension notes given to orators and due on the 1st of January, 1893, and are insolvent, and that the pretended sale to defendants was made in contemplation of their insolvency and to avoid an equal distribution of said property among their creditors."

The prayer of the bill was, that "upon a final hearing your orators pray your honor to render a decree declaring that the property conveyed to said defendants as aforesaid, to be a trust fund for the equal benefit of the creditors of the said The Montgomery Carriage Works including orators and that said defendants be held as trustees, and to hold said property in trust for the benefit of your orators and the other creditors of the Montgomery Carriage Works. And that they be made to account for all the property included in said bill of sale and account for the proceeds of such as may have been sold by them with interest thereon. And orators pray for all such other or further relief as the nature of their case may entitle them to and as shall seem proper to your honor."

The respondents demurred to the bill, and moved to dismiss it for the want of equity, and also interposed a plea, which was as follows: "By way of plea these defendants say that the said Montgomery Carriage Works in violation of their said agreement not to create any new indebtedness until all of said notes were paid in full, created and contracted other and additional indebtedness for the purchase of goods to the large amount of about seven hundred dollars without their knowledge or consent, and by reason of said default and breach of said agreement they aver that the notes given them by said Carriage Works in said settlement became immediately due and collectible and were due and collectible at the time of said sale."

Upon the submission of the cause, upon the pleadings, the chancellor overruled the demurrer and motion to dismiss the bill, and also overruled the plea interposed. From this decree the present appeal is prosecuted, and the same is here assigned as error.

HORACE STRINGFELLOW and EDWARD A. GRAHAM, for appellant.—"When parties have deliberately put their engagements into writing in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing, and all oral testimony of a previous colloquy between the parties, or of conversations or declarations

at the time when it was completed, or afterwards is rejected, as it would tend in many instances to substitute a new and different contract for the one which was actually agreed upon to the prejudice possibly of one of the parties.''—*Haynie v. Robertson*, 58 Ala. 38 ; 1 Greenleaf on Evidence, § 275 and note 3 ; *Couch v. Woodruff*, 63 Ala. 466.

2. There is only one provision in the agreement, that the creditors should act together, and that is that each creditor receive the notes in extension of his claim, after that they were to act as before, each for himself. All the notes of the debtor in case of default by the debtors in the performance of their obligations, were ''immediately to become due and collectible.'' This stipulation is absolute and unqualified, and has been construed by this court in the case of *Chambers v. Marks*, 93 Ala. 412, 418, as obligating the defendant to pay without further delay and entitling plaintiff to demand and enforce payment by ''any remedy which the creditor would have had on the maturity of the notes.'' Upon default being made therefore the contract contemplated that any creditor or his transferee of his notes could demand payment of his notes and enforce the same by ordinary process of law. At law priority of time gives priority of right. If each creditor had the right under the agreement in case of default to collect his notes in full out of any or all of the property of the debtors by action upon his notes, in which none of the other creditors could join, then certainly there could be no common fate, one would be first, another second, one would get all his claim, another a part, and others none. They could not act as a unit in an action at law. There could be no *pro rata* distribution. On the other hand if they had to share a common fate, and act as a unit their notes would not become due and collectible by ordinary action, as the agreement provided.

Again, it is equally clear that the agreement contemplated and provided for a payment of the notes, singly, and in full (for there could be no other payment), even before the times stated in the agreement, and on their face for them to be paid.—Tiedeman on Com. Paper, § 25a. The day after the notes were executed, the debtors had the right to pay a note maturing on the 1st day of July, 1894, the day fixed for the maturity of the last

of the notes given "in settlement," for that note provided that the debtors could pay it on or before said date. The right of the debtors to pay, provided for in the agreement, was absolute, unconditional. It was a right to pay any note before it was due, not a right to pay, provided all, or even a portion of the notes were paid. A right to pay any note in full according to its terms, for no holder was bound to receive a part of his note.—18 Amer. &. Eng. Encyc. of Law, p. 233. If the debtors had the right at any time to pay any note in full, then the holder, whether an original creditor or his transferee, had the right at any time to receive payment, without regard to the other creditors, or the effect of such payment upon the ability of the debtors to pay them. Otherwise the right to pay could not exist.

These payments of one or more of the notes by the debtors necesssarily constituted preferences. Every payment by a debtor is a preference. It might follow that such payment might leave the debtor unable to pay the remainder of the notes outstanding, or pay them in full.—Burrill on Assignments, § 160. Yet, these preferences were, as we have shown, contemplated by the contract. The debtors could exercise this right of preference, not only in the form of the actual payment of money, but also in the form of appropriation of property.—Burrill on Assignments, § 161; *Pollock v. Meyer*, 96 Ala. 176; Bump on Fraudulent Conveyances, pp. 178, 182; *Robinson v. Rapelye*, 2 Stewart 100.

What the agreement was we have shown. It contained nothing but personal obligations upon the part of the debtors, and in no way affected their property or any part of it. If the debtors contracted additional indebtedness, in violation of their agreement, the only effect would be to make all other notes due and collectible; the additional indebtedness would be valid claims against them, enforceable by action at law and the subjection of their property under execution. The plea, therefore, presented a sufficient defense.

MARKS & SAYRE and WILLIAM A. GUNTER, *contra*.—1. "It is a general rule of law that the acceptance of a lesser sum or an agreement to accept it, does not bar a demand for a greater sum," but in the same able opin-

ion, they fully recognize the exception to the rule in cases of a composition by a debtor with his creditors, using the following language : "The beneficial consideration to each creditor is the engagement of the rest to forbear." "A fund is thereby secured for the general advantage of all ; and if any one of the parties were allowed afterwards to enforce his claim, it would operate to the detriment of the other creditors, who have relied on his agreement to forbear, and it might even deprive them of the sum it was mutually agreed they should receive, by putting it out of the power of the debtor to carry out the composition.—*White v. Kuntz*, 1 Amer. St. Rep. 887. The bill shows that the invitation of the Montgomery Carriage Works to their creditors to attend a meeting, was for the purpose of having them "decide what was the best course to be pursued by them, and to determine what should be done in reference to the application of the assets of the Montgomery Carriage Works to the equal payment of their creditors." It was for the purpose of securing the equal application of the assets of their common debtor that the creditors of the Montgomery Carriage Works assembled, coming from all points of the compass. It was that object they sought to accomplish by the agreement entered into. The proposition made by the Montgomery Carriage Works, after the meeting assembled, was first, to then and there turn over their assets for equal division among their creditors, or, second, to retain the same in their possession, for the purpose of realizing on them in the regular course of trade and applying the proceeds, *pro rata*, among their creditors. It was the latter proposition which was accepted, with the modification that the creditors should have supervision of the conduct of the business. The proposition at the creditors' meeting was verbal. The acceptance was also verbal as to all the creditors who were present at the meeting. The recommendation of the committee of creditors, was in writing, but was made to the *creditors*, and not to the debtor. The proposition of the Montgomery Carriage Works and the acceptance thereof, by the creditors, constituted the composition agreement. It is not essential that a composition agreement should be in writing.—3 Am. & Eng. Ency. of Law, p. 387, Sec. 3, and authorities there cited.

2. What is the legal effect of a composition agree-

ment?   In the case of *Perkins v. Lockwood*, 100 Mass. 249, the court says : "The reason for upholding such an agreement is that the rights and interest of other parties become involved in the arrangement, and this affords a new and legal consideration for the promise.   It would be contrary to good faith for a creditor who has secured the advantage of such an arrangement, to disregard its obligations by proceeding to enforce the balance of his demand ; and the debtor is entitled to avail himself of this consideration in defense."   In the note to the leading case of *Cumber v. Ware*, 1 Smith's Ld. Cases, it is said : "Such an agreement if entered into by a number of creditors, each acting on the faith of the engagement of the others, will be binding on them, for each, in that case, has the undertaking of the rest as a consideration of his own undertaking."   And so of an agreement to give time.—*Good v. Cheesman*, 2 Barn. & Ad. 328.

3.   It does not affect the binding force of the agreement as between the creditors, or between them and the debtor, that they were mistaken as to the mutual benefit to be derived.   The question to be determined by the creditors was whether it would be better for them to take possession of the debtors' assets, subject to the right of the landlord of attachment for $22,000 for rent for the entire term, or to leave the possession of the assets in the hands of the debtor, subject to their supervision, to be realized upon in the ordinary course of trade, and have the proceeds applied *pro rata* among them. Wisely or unwisely, they decided upon the latter course, and having so decided, the agreement to that effect is binding on them all, both in letter and spirit.   The common object sought to be obtained was the equal *pro rata* application of the assets of their common debtor to the debts of the composition creditors.   Any arrangement entered into (without the knowledge of the others) by and between the debtor and a portion of the composition creditors, whether at the time, or subsequent to the composition agreement, whereby greater benefits were to accrue to some over the others, who were not privy to the secret agreement, is, as to such others, fraudulent and void.— *White v. Kuntz*, 1 Amer. St. Rep. 886 ; *O'Brien v. Greenebaum*, 92 Cal. 107 ; *Kullman v. Greenebaum*, 92 Cal. 403.

4.   The defense of the composition agreement, which

could otherwise have been interposed by the debtors, has been lost to them by their own misconduct. Any assets of the debtors not embraced in the trust property, left in their hands, could have been subjected to the satisfaction of such judgments. But the assets of the debtors, which were embraced in the composition agreement, could not cease being a trust fund as between the creditors themselves, by the wrongful conduct of the debtors, with which they had nothing to do. Nor could it cease being a trust fund between the creditors and the debtors by such means. Upon the violation of the composition agreement by the debtors, proper proceedings could have been instituted to subject the trust property to the equal *pro rata* payment of all the creditors. All could have moved for each, and each for all.—*Kullman v. Greenebaum*, 92 Cal. 403 ; *O'Brien v. Greenebaum*, 92 Cal. 107.

HEAD, J.—The reasoning and conclusions expressed in the following opinion, except in respect of the special plea interposed by the defendants, are the individual views and conclusions of the writer only.

On December 31, 1892, the defendants, Montgomery Carriage Works, a partnership, sold and conveyed to their co-defendants (appellant), substantially all their property, in absolute payment of existing debts, severally, owing to the latter. The complainants are creditors of the partnership, and file this bill in behalf of themselves and all other creditors who will come in, make themselves parties complainant, and contribute to the expenses of the suit. It will be noticed that all creditors are invited, and have the right to come in and join in the suit, without regard to when their demands were contracted, or what relations they bore to the transactions out of which the special equities the bill seeks to enforce are supposed to have arisen. It would seem, therefore, that to maintain the bill, in this shape, it must show a case whose equity inures alike to every creditor of the partnership, though his debt were contracted on the day, but before, the bill was filed. The complainants' claim is, that the property sold and conveyed, as aforesaid, is charged with a trust in behalf of all the creditors of the partnership ; and the prayer is, that the purchasing defendants be decreed to be trustees and held to account as such. The case was formerly be-

[Bank of Montgomery *et al.* v. Ohio Buggy Co. *et al.*]

fore us, then, as now, on demurrer tot he bill, and it was held, the then Chief Justice delivering the opinion of the court, that the bill contained equity.—100 Ala. 626.   We have, however, upon the re-argument, on the present appeal, again given the case careful consideration, and the writer is unable to see, now, how, upon sound reasoning, we can adhere to that conclusion.

It will be observed that the bill is not one to reach equitable assets of the debtor upon which complainants have no lien.   Being simple contract creditors, merely, they can obtain no such relief.   Nor is it a bill to reach property fraudulently conveyed by the debtor, for there are no allegations nor prayer looking to relief of that nature.   Nor does it assert a statutory lien of any character.   The complainants' equity, therefore, if any they have, must necessarily consist in a lien or charge upon, or equitable interest in, the property, created *by contract* with some holder of the legal title, entered into by themselves, or some other or others with whom they are in privity.   We must look to the bill then to see if it discloses a lien or charge or interest, so created.

The facts, as the body of the bill avers them, are simpply these :   That the said Montgomery Carriage Works, being embarrassed and unable to meet their debts, at maturity, if not actually insolvent, owing the complainants the debts they now seek to enforce, and the defendants, the debts which said property was sold and conveyed to pay, and owing others, on February 8, 1892, sent a circular letter to all their creditors, stating that they were temporarily embarrassed ; that they desired to place themselves in the hands of their creditors, without preference or favor, and calling upon them to attend a meeting to be held in Montgomery, Ala., on February 17, 1892, to decide what was the best course to be pursued by them, and to determine what should be done in reference to the application of their assets to the equal payment of their creditors.   Responding to this request, fourteen of the creditors, representing about three-fourths of the indebtedness, met and organized, and the attorney of the debtors stated to the meeting that they placed themselves and their assets in the hands of their creditors for an equal and fair *pro rata* division among them ; that if their creditors so desired, they would then and there execute a general assignment for the benefit of all

their creditors and turn over all their assets. The attorney further stated that it would be, however, more advantageous to the creditors if they would permit the debtors to retain possession of the assets, as a trust fund, for the purpose of realizing on them, in regular course of trade, applying the proceeds *pro rata* among their creditors. Thereupon, a committee of the creditors was appointed to consider the situation and report what course should be pursued, under the circumstances. This committee reported that they "do recommend that the proposition of the said Montgomery Carriage Works be accepted, and an extension be granted said debtors as follows: Said Montgomery Carriage Works to execute and deliver to each of its creditors its notes for the amounts due each creditor in four equal amounts, payable on or before the first day of January, 1893, July, 1893, January, 1894 and July, 1894, with interest at six per cent, payable annually, payable at a bank in Montgomery, Alabama. Said debtors to execute an agreement not to create any new indebtedness until all of said notes are paid in full. Said debtors to reduce and keep their expenses at the lowest possible point, and to submit their books to the inspection of any of its creditors, or their duly appointed representatives, whenever requested. In the event said debtors created other or additional indebtedness, or fail to pay any part of said notes when due, then and in such event all the notes given in settlement as herein provided, shall immediately mature and become due and collectible. This report means that in case it is necessary, in the conduct of the business of the Montgomery Carriage Works to purchase goods, no more shall be purchased than are necessary, which goods shall be paid for in cash, as soon as they are in their store and checked." The report was unanimously adopted by the meeting, and the Montgomery Carriage Works appended its written expression of its assent thereto, and agreement to comply with its terms; and they thereupon addressed a letter to each of their creditors, not present at the meeting, purporting to embody substantially what had been done at the meeting, and requesting his assent to, and acceptance of, the terms agreed upon at the meeting. A copy of this letter is made an exhibit to the bill. All the creditors accepted the terms. Most, if not all, of the defendants were present or represented at the

24

meeting. It seems that none of the complainants were present at the meeting; so their acceptance was of the terms, as they were stated in the letter addressed to them by the debtors. That letter substantially stated what the bill avers occurred at the meeting, with the exception, that it represents quite differently the statement made by them to the creditors. It contains this recital: "Thereupon, we made a statement of our condition, which was substantially that given you in our letter of the 18th inst. and placed ourselves in the hands of our creditors, with the declaration that we would abide by their judgment as to what was best to be done, but requested that we be permitted to continue business in order that we might pay our creditors in full and save something for ourselves out of the result of many years hard work. After our statement was ended, on motion, a committee was raised,"&c., going on to show what that committee reported, as we have hereinabove set out. Nothing was said, according to this version, in reference to the debtors placing their assets in the hands of their creditors for an equal and fair *pro rata* division among them; nor to the execution of a general assignment for the benefit of all their creditors; nor to being permitted to retain possession of their assets as a trust fund, for the purpose of realizing on them in regular course of trade, applying the proceeds *pro rata* among their creditors, as the bill avers. It was, I say, the version of what had occurred, as contained in this letter, that the complainants and other non-attending creditors acted upon, in making their acceptance, and that must be treated as the true version. This view of the case eliminates the question whether so much of the report of the committee as recommended that the proposition of the Montgomery Carriage Works be accepted, does not refer to their proposition, averred in the bill, to hold their assets as a trust fund for the purpose of realizing on them in the regular course of trade, applying the proceeds *pro rata among* their creditors; and whether such a verbal security or mortgage, which it would seem, in effect, to be, can be enforced against the debtor, as valid.—Code, § 1371. Indeed, the bill clearly commits all parties—the creditors present at the meeting, those not present, and the debtors—to the statements of the letter, as being the only and true exponent

of what occurred and was agreed upon, outside of the written report itself; for it distinctly avers that, upon the report of the committee being adopted, the letter was drawn up, *with the knowledge and consent* of all the creditors present at the meeting, and a copy thereof was mailed to each creditor not present. It thus, manifestly, comes within the influence of the familiar principle that when an agreement is reduced to writing, all prior and contemporaneous stipulations are merged in the writing, which must be received as the sole memorial of the contract. Then, interpreting the representation of the committee, "that the proposition of said Montgomery Carriage Works be accepted," in the most favorable light for the complianants, we must look to what was written in the letter, and in the report itself, to ascertain what the proposition was. Doing this, we find the full complete analysis of the whole transaction to be, that, for a valuable consideration moving from each to the other, the creditors, upon request of the debtors, agreed to divide their debts into four parts, and take negotiable promissory notes therefor, extending payments to the first of January and July, 1893 and January and July, 1894, at six per cent interest; thus permitting the debtors to continue their business, in order that they might pay their creditors in full, and save something for themselves out of the result of many years of hard work; and the debtors, on their part, agreed to keep their expenses at the lowest possible point; to submit their books to the inspection of any of the creditors, whenever requested, and to incur no new debts until all said notes were paid in full, except that if it be necessary, in the conduct of their business, to purchase goods, they might purchase them, paying for the same as soon as they were in their store and checked. In the event they incur the prohibited additional indebtedness, or fail to pay any of said notes when due, the penalty prescribed was that all the notes should immediately become due and collectible. The notes were executed and delivered, as agreed upon, and the Carriage Works went on with their business. Thus we see, according to the letter of the contract, the agreement on the part of the creditors was, in itself, a completely executed one. There was nothing of an executory nature in it—no stipulation capable of being bro-

ken. They simply agreed to extend their debts, in the manner specified; and the agreement itself and the acceptance of the notes, completely accomplished that fact, and put it without their power to enforce collections in opposition to the agreement. Any action prematurely brought by them would have been defeated by plea and proof of the agreement itself. But, it is said, this agreement goes beyond its express terms, and implies the following further stipulations, viz., that the creditor should, not only, not coerce payment by suit, as expressed, but that the debtors should not make, nor he accept, voluntary payment of the debt, before the time to which it was extended; and that any sum of money, or article of property, so voluntarily paid or transferred, and accepted by the creditors, should thereby become charged with a trust in behalf of all the creditors; and the receiving creditor held as a trustee and liable to account as such. This supposed stipulation, upon its face, is novel and peculiar; indeed, so much so that it is not easy to perceive how the law can be brought to imply it. It absolutely prohibits, and renders unlawful, a voluntary payment or transfer by the debtors, yet authorizes and legalizes it, by declaring its effect and ascribing rights to the parties under it. In other words, it declares a prohibition upon a particular act, then authorizes a breach of it, and declares the effect of the breach. Parties may make express contracts of this character, if they choose, but the law never implies or anticipates that an agreement will be broken. It never *implies* an *alternative stipulation* dependent upon the breach even of an *express* one, much less the breach of one itself implied. The alternative, which it is said, the law must imply in this case, viz., that the transfer was made in view of an implied agreement of the parties that a trust should attach to it, in behalf of all the creditors, is, it seems, repugnant to the views of the complainants themselves; for, in their bill, they denounce the transfer as a pretended sale, made by the debtors, in contemplation of their insolvency, and to avoid an equal distribution of the property among their creditors. Bearing in mind, that the equity of this bill must be supported, if at all, upon the proposition that the transfer in question was affected by an agreement between the complainants and defen-

dants, by which the making of it was impliedly author-
ized, and its effect impliedly declared to be the creation
of a trust in the property transferred, in favor of all the
creditors, it is not easy to perceive how the complain-
ants may denounce it as a pretended sale, in the terms
above stated. We mention this to show, that they suffer,
in common with the writer, the difficulty of compre-
hending how the implied agreement and trust, upon
which the bill is based, can grow out of the occurrences
alleged.

This implied agreement is peculiar in another respect.
It is, according to the frame of the bill and the relief
sought, far reaching and comprehensive. It makes no
distinction between property owned by the debtors at the
time it was made and that subsequently acquired; but
all is within its grasp. It is not averred in the bill that
an article of the property conveyed to the defendants
was owned by the Carriage Works at the time of the
agreement. The supposed trust so accommodates itself
to conditions, that it turns loose its hold upon property,
when sold by the debtors to others than a creditor, and
fastens itself upon any new property the debtor may
acquire. Nor does it discriminate between then existing
and subsequent creditors, whether the liability of the
debtors arose *ex contractu* or *ex delicto;* but all may come
in and share as beneficiaries of the trust. They may
never have assented to the trust agreement, or bound
themselves, for a moment, to postpone collection of
their debts, yet, under the bill, their rights are the same
as the rest.

I am of opinion that the agreement the parties made
means only what it plainly says. The creditors agreed
to nothing but the extension of their debts. They did
not bind themselves not to accept payment of their debts,
if voluntarily tendered them; nor did the debtors bind
themselves not to pay a debt. The parties were compe-
tent to make such contract, and put it in such form, as
they chose. If they had desired to provide for the dis-
tribution of the property of the debtors, on any contin-
gency, they could, all parties assenting, have easily done
so. But no reference is made to any distribution, what-
ever, to take place at any time, or on any contingency.
No trust, of any sort, to take effect either before or after
the notes, or any of them, should mature, is, in the con-

tract as made, even remotely hinted at.   On the maturity
of the notes, and their non-payment, considering all
their property still in the hands of the debtors, it would
have been merely a race of diligence between the credit-
ors.   Before maturity, their remedies were suspended,
and the property was in the hands of the debtors, by the
same absolute, unincumbered title by which it was
always held, and capable of any transfer they might
choose to make which did not effect a fraud on the rights
of their creditors.   Such a right of transfer is an insep-
erable incident to such an ownership.

It is said, in our former opinion, that the agreement
has many of the controlling properties of a composition
among creditors with their common debtor.   That is
true, and it is that which constitutes the *consideration*
which supports the agreement of each to extend his debt;
just as, in a case of composition proper, the composition
—the combined agreement of all the creditors—consti-
tutes the consideration which supports the agreement of
each to receive less than his whole debt, in full payment.
If every creditor of a debtor, acting independently of the
others, agrees to extend, or to receive less than the whole,
in full payment, his agreement does not bind him, for
the want of consideration; but if it is a combined agree-
ment of all the creditors, this concurrence or composition
forms a valuable consideration, and each is bound.   But
we must not permit the fact that the *consideration* as-
sumes this form, to mislead us to an enlargement or
extension of the *terms* of the agreement which it supports.
We must look to the terms themselves to ascertain their
import.   When, as in the present case, we pass over this
mutual meeting and concurrence of the creditors, as form-
ing the consideration of the contract, and look at what
they set down in the contract, as the things agreed to
be done or omitted, we find them stated without doubt
or ambiguity—so plainly stated that they do not admit
of construction.   The statement in our former opinion,
that "By an irresistible implication, it was an agreement
among all the assenting and acquiescing creditors to move
as a unit, and share a common fate, at least until default
should be made by the debtors," I now think, is inacu-
rate.   The agreement was that the creditors would not
move at all; indeed they disarmed themselves of all
power to move; and most surely, the common fate, or

fortune, we should say, which they anticipated, was that their debts would all be paid in full and something left for the debtors. But, suppose such were the implication and agreement, what were the consequences of their breach? I would suppose, a right of action for the recovery of such damages as proximately resulted from the breach committed. If no substantial damage, capable of legal admeasurement, resulted, then nominal damages for the legal wrong done. Can it be, for a moment, supposed, that if acceptance of voluntary payment of his debt by the creditor was a breach of this implied agreement, that its natural, proximate result was a right, in equity, of the other creditors to declare a trust upon the money or property received in payment? I know of no canon of construction which would justify the supposition.

I am of opinion the demurrers and motion to dismiss the bill for want of equity, ought to have been sustained.

But we are all of opinion that the special plea interposed by the defendants ought to have been sustained. This plea alleges that the said Montgomery Carriage Works in violation of their said agreement not to create any new indebtedness until all of said notes were paid in full, created and contracted other and additional indebtedness, for the purchase of goods, to the large amount of about seventeen hundred dollars, without the knowledge or consent of defendants; and by reason of said default and breach of said agreement, the defendants aver that the notes given them by said Carriage Works, in said settlement, became immediately due and collectible; and were due and collectible at the time of said sale. It will be remembered that it was stipulated in the agreement that the said debtors should not create any new indebtedness until all of said notes given by them should be paid in full; and in the event they should create other or additional indebtedness, then, all the notes given in settlement, as provided in the agreement should immediately mature and become due and collectible. Hence, if new or additional indebtedness was contracted, as alleged in the plea, the defendants' notes became, by law, collectible, and the defendants had the right to accept payment thereof. For the error in overruling the plea, the decre-

tal order of the chancery court is reversed and the cause remanded.

Reversed and remanded.

BRICKELL, C. J., not sitting, having been of counsel.